THE CITY OF ST. LOUIS v. THE O'NEIL LUMBER COMPANY, et al.; DOYLE et al., Appellants.

Division One, February 6, 1893.

1. **Mechanic's Lien:** FORECLOSURE: RATABLE DISTRIBUTION OF ASSETS. Notwithstanding the mechanic's lien law, Revised Statutes, 1889, section 6727, which provides for the ratable distribution of the proceeds of a foreclosure sale among all the lien claimants does not, apply to a city building, yet a clause in a contract for the erection of such building requiring the city to withhold from the contractor sufficient funds to pay "all persons who have done work or furnished materials under this agreement and are entitled to a lien therefor," indicates a clear purpose that the policy of the lien law is to be carried out, and where the fund due the contractor is brought by the city into a court of chancery for a distribution among the mechanics and materialmen, it will be distributed ratably among them all, rather than to give priority to the one first instituting legal proceedings.

2. **Equity:** CREDITORS' BILL: ASSETS: PRIORITY. The principle that a creditor first filing suit to set aside a fraudulent conveyance is entitled to priority over the other creditors, does not apply to a case where the debtor simply absconds leaving visible assets in the hands of a city, which, under the policy of the law, can only be compelled to account for them and distribute them by a court of equity.

3. ——: ——: ——: RATABLE DISTRIBUTION. While a court of equity will afford a remedy to creditors against assets in its custody or which can be reached only by it, yet such courts cannot create for such creditors' benefit either the process of garnishment or the remedies to be acquired under the mechanic's lien law and are not constrained to a distribution of those assets to creditors according to .the principle that would obtain under the law governing either, but will make such distribution according to right and justice.

*Certified from St. Louis City Court of Appeals.*

REVERSED AND REMANDED.

*J. H. Trembley* for respondent O'Neil Lumber Company.

(1) The amount of $976.11, due McLane when he absconded, was a valid legal claim for the recovery of which he, McLane, could then have maintained an action against the city. *Yeats v. Ballentine*, 56 Mo. 530; *Eyermann v. Cemetery Ass'n*, 61 Mo. 489; *Ahern v. Boyce*, 19 Mo. App. 552; *Austin v. Keating*, 21 Mo. App. 30. (2) A bill, in the nature of an equitable garnishment, it is useless to say, is the proper proceeding for reaching funds belonging to a debtor in the treasury of a municipal corporation, and, when the debtor has absconded, so that the claim cannot be reduced to judgment, a court of equity will entertain jurisdiction in the first instance, and give such a proceeding, founded on an ordinary claim, the same effect as that founded on a judgment at law,. after the return of an execution *nulla bona*. *Pendleton v. Perkins*, 49 Mo. 565. (3) The claim of the O'Neil Lumber Company being for materials used in doing the work contemplated by the ordinance that appropriated the money now in court, its equities, apart from the question of priority, are equal to those of any other interpleader herein, and by its superior diligence in

instituting proceedings on November twenty-second, 1888, against McLane and the city, in the nature of an equitable garnishment, it acquired the right to be first satisfied out of the $976.11 then due McLane from the city. *City v. Keane,* 27 Mo. App. 642.

*Rassieur & Schnurmacher* for respondents Higgins & Sellers.

(1) A bill in equity, seeking to subject to the payment of a creditors' claim, the assets of his debtor in the hands of one beyond the reach of legal process, is in the nature of and similar to a garnishment at law. It is often styled an equitable garnishment. *Pickens v. Doris,* 20 Mo. App. 1; *Pendleton v. Perkins,* 49 Mo. 565; *Lackland v. Garesche,* 56 Mo. 267. (2) In such case a court of equity will grant the creditor the same rights against the debtor's assets as he would have had in a court of law had the assets been accessible by process. But no new rights are created; the court merely undertakes to furnish a remedy. Authorities, *supra.* (3) In a garnishment proceeding, only such funds can be reached by the creditor as belong to his debtor; the creditor's rights can be no greater than the debtor's. *Weil v. Tyler,* 38 Mo. 545; *Firebaugh v. Stone,* 36 Mo. 111; *Karnes v. Pritchard,* 36 Mo. 135. (4) Therefore, since McLane was not entitled to that much of the fund in court earned by defendants, Higgins & Sellers, after his departure, it cannot be applied towards the payment of McLane's debts. (5) There is nothing in the contract which gives McLane's subcontractors a lien upon that portion of the fund. The obligation of the sureties is, by the terms of the contract, purely to the city. In this respect it differs from the bonds in the cases of *Luthy v. Woods,* 6 Mo. App. 67, and *City v. Keane,* 27 Mo. App. 642. (6) The liability of a

surety will not be enlarged by implication. On the contrary, his obligations will be construed strictly and he will not be held beyond the express terms of his contract. *Blair v. Ins. Co.*, 10 Mo. 560; *Prior v. Kiso*, 81 Mo. 241.

BRACE, J.—This case is certified here from the St. Louis court of appeals under section 6 of the amendment of the constitution adopted in 1884.

The statement of the case made by Judge BIGGS of that court is as follows:

"On the seventeenth day of July, 1888, the municipal assembly of the city of St. Louis passed an ordinance authorizing the board of public improvements to contract for certain alterations and repairs at the House of Refuge. Section 2 of the ordinance is as follows: 'The cost of the above work shall be paid by the city of St. Louis, and the sum of $4,500 is hereby appropriated out of funds set apart for improvements, alterations and repairs of the House of Refuge.' The work was let to one James McLane under three separate contracts. Contract number 2071 provided for the erection of two new privy buildings at a cost of $2,800. By contract, number 2083, McLane agreed to make certain alterations in the basement and in the dormitory of the old building for the sum of $850. The third contract, number 2076, provided for furnishing lumber and laying the floor in the shoe shop of the House of Refuge. The foregoing contracts were signed by McLane as principal and the interpleaders, Thomas C. Higgins and John M. Sellers, as his sureties. Among other things the contracts provided that 'in case the contractor shall abandon the work * * * the commissioner of public buildings shall have power under the direction of the board of public improvements to place such and so many persons as he may deem advisable by contract

or otherwise to work and complete the work to be done, and to use such materials as he may find on the line of said work, or to procure other materials for the completion of the same and to charge the expense of said labor and materials to the contractor; that this expense shall be deducted and paid out of such moneys as may then be due, or may at any time thereafter grow due to him under the contract; and, in case such expense is less than the amount still due under the contract, had it been completed by the contractor, he shall be entitled to receive the difference, and, in case such expense is greater, the party of the first part (which included the contractor and his sureties) shall pay the amount of said excess.'

"The contracts also contained the following provision: 'And said party of the first part (which includes the contractor and his sureties) hereby further agrees that he will furnish the said board of public improvements with satisfactosy evidence that *all persons who have done or furnished materials under this agreement and are entitled to a lien therefor*, under any law of the state of Missouri, have been fully paid are no longer entitled to such lien; and in case such evidence be not furnished such amount as the board may consider necessary to meet the lawful claims *of the persons aforesaid*, provided said persons shall notify said board before the final estimates be returned, shall be retained from the moneys due the said party of the first part under this agreement until *the liabilities aforesaid* may be fully discharged.' Under paragraph S. of the contract an estimate of the amount of the work done each month is to be made about the first of each succeeding month and a valuation according to the current market prices put thereon; from the amount of such estimate, ten per cent. is to be deducted and the balance certified as due.

"The obligation of Higgins & Sellers binds them with McLane to the city of St. Louis and for the faithful performance of the foregoing contracts in every particular. The foregoing quotations from the contracts are believed to be sufficient for an understanding of the legal propositions arising upon this record.

"McLane entered upon the work and continued it until the twentieth day of November, 1888, when he absconded from the state, leaving the work in an unfinished condition. It is conceded that up to the first day of November the city had paid to McLane, for work done and materials furnished under contract number 2071, the sum of $1,003.50. This would leave the sum of $1,796.50 due from the city if the work should be completed. The work under contract number 2083 was also left in an unfinished condition. Monthly estimates of the work under this contract had also been made, and, up to the first day of November, McLane had been paid on account thereof $607.50, leaving a balance due from the city, if the work had been completed, of $242.50.

"The work under the third contract had been fully completed and paid for. It was also admitted that, in addition to the amounts earned by McLane under the two contracts, between the first and twentieth of November, the city owed him the sum of $37 for work done at the house of refuge not embraced in either contract.

"When McLane abandoned the contracts, the city made an arrangement with Higgins & Sellers to complete the work. No new contract was entered into. The work was to be completed under the old contracts. Higgins & Sellers finished the work to the satisfaction of the city authorities. A few days after this arrangement with Higgins & Sellers, the O'Neil Lumber Company, one of the interpleaders, filed a suit in equity

against McLane and the city, in which it claimed that McLane was indebted to it for lumber furnished on account of said contracts, of the value of $750, and it asked that this amount be charged against the remainder of the money due from the city under the contract. Then followed a like suit by John M. and Edward Doyle, the appellants herein, in which they claimed to have performed work and furnished materials to McLane, under contract number 2071, of the value of $1,304. They sought to make their claim a charge upon the balance due from the city under said contract number 2071. Other mechanics and material-men followed with like suits, but, under the view we have taken of the case, it will not be necessary to notice them. When Higgins & Sellers completed the work, they claimed that the work done and the materials furnished by them in the completion of contract number 2071 actually cost them the sum of $1059.89; that they did work in completing contract number 2083 of the value of $40; and that they did extra work under the last-mentioned contract amounting to $29.50 making a total of $1,129.30. Their contention was and is now, that as they had earned this amount in the completion of the work, they were entitled to be first paid out of the balance of the funds due under the McLane con-tracts, in preference to the O'Neil Lumber Company and Doyle Brothers.

"When the city found itself beset with these con-flicting claims, it brought into court the amount due from it under the McLane contracts, to-wit, $2,105.50. The foregoing facts were stated in its petition, and the court was asked to compel the claimants to interplead for the fund and that they be restrained from the further prosecution of the suits against the city. The neces-sary orders were made, and thereafter such proceedings were had in the case as to result in a trial between the

several interpleaders of their respective claims to priority. The court held that Higgins & Sellers must be paid first. This left a balance of $976.11 which the court found had been earned by McLane between the first and twentieth of November. As the O'Neil Lumber Company was the first to institute suit and have the city served with process, the court gave its claim priority over those of the other interpleaders and ordered it to be paid in full. The suit of the Doyle Brothers being the next in point of time, the remainder of the fund, to-wit, the sum of $225.60, was ordered paid to them. From this order of distribution, Doyle Brothers have prosecuted their appeal."

The court of appeals affirmed the judgment of the circuit court, all the judges agreeing that out of the funds to be distributed the amount found to be due Higgins & Sellers must be first paid. But to the conclusion reached by a majority of the court of appeals and the circuit court, that the remainder should be distributed among the interpleaders according to the priority of their suits, Judge THOMPSON dissented, and filed a dissenting opinion, as follows:

"The statute relating to mechanics' liens contains the following section: 'The liens for work and labor done or things furnished, as specifiied in this article, shall be upon an equal footing, without reference to the date of filing the account or lien; and in all cases where a sale shall be ordered and the property sold, which may be described in any account or lien, the proceeds arising from such sale, when not sufficient to discharge in full all the liens against the same, without reference to the date of filing the account or lien, shall be paid *pro rata* on the respective liens, provided such account or liens shall have been filed and suit brought as provided by this article.' Revised Statutes, 1889, sec. 6727; Revised Statutes, 1879, 3193.

VOL. 114—6

"With this statute in force the city of St. Louis in making the contract with McLane inserted the following provision: 'And said party of the first part (which includes the contractor and his sureties) hereby further agrees that he will furnish the said board of public improvements with satisfactory evidence that *all persons who have done work or furnished materials under this agreement and are entitled to a lien therefor* under any law of the state of Missouri, have been fully paid or no longer entitled to such lien; and in case such evidence be not furnished, such amount as the board may consider necessary to meet the lawful claims *of the persons aforesaid,* provided said persons shall notify said board before the final estimates be returned, shall be retained from the moneys due the said party of the first part under this agreement until the *liabilities aforesaid* may be fully discharged.'

"With this provision in force, indicating the policy of the state to be that all mechanics and materialmen entitled to liens shall share ratably, the city sees fit to insert this clause in its contract with the mechanic, indicating a clear purpose on its part to see that the policy of the statute is carried out, and that it will withhold enough of what is due to the principal contractor to pay his subcontractors or materialmen. It is true that such persons are not, under the law as judicially construed, entitled to a mechanic's lien against any property belonging to the city; but that does not seem to afford a good reason why no effect whatever should be given to this clause of the contract. The city had no right under the decision of *Luthy v. Woods*, 6 Mo. App. 67, and *St. Louis v. Keane*, 27 Mo. App. 642, to hold enough of what was due McLane, in the character of trustee for the materialmen who had had furnished to him materials which he used in the work. But events took such a turn that there was not enough for

all, and the city finding itself thus embarassed, instead of executing the trust itself, brought the fund into a court of equity and asked that court to administer it, in other words, asked that court to require the contend-ing parties to interplead for it, which was done.   It is also true that the city has not, under the terms of the contract, elected to set this fund apart and to hold it for any particular beneficiary.   But nevertheless, I cannot but think that it ought to be distributed, not according to the attachment law, but according to the policy of the mechanic's lien law.   This clause of the contract has no doubt existed, in the contract forms on which the city lets out contracts for city buildings, from a time when it was supposed that the city build-ings were liable to mechanics' liens.   Persons supply-ing materials to city contractors may fairly be presumed to know that such a clause exists in such contract; they may, therefore, be fairly presumed to give credit to the contractor on the faith of being protected by the city. But this faith is broken, and this just expectation dis-appointed, when the creditor that makes the first grab at the fund set apart for all gets a preference over the other, albeit in a court called a court of equity.

"The ground on which this result is reached, if I understand the reasoning, is that this fund has never been impressed with the character of a *trust*, which distinguishes the case from the previous decisions of this court.   To my mind it is a conclusive answer to this to say that the city has done all that. it could safely do to impress the fund with the character of a trust fund for the equal benefit of the materialmen, and has certainly not indicated a contrary purpose by handing it over to a court of equity for distribution.

"But it is said that the proceedings in equity, which were taken against the city by the materialmen before the petition of interpleader was filed, were

'equitable garnishments' and therefore the provision of the attachment law is to be imported into a court of equity, under which, instead of doing equity by making a ratable distribution among the creditors of equal merit, the rule of distribution is to be first come first served. It is true that in judicial decisions in this state, the proceeding has been denominated an 'equitable garnishment.' But that expression was used for the mere convenience of having a name for an anomolous proceeding; it was not used with reference to the question of priorities which we are here considering. To my mind there is no such thing as an 'equitable garnishment,' in the sense in which it is here sought to employ the term, any more than there is an equitable indictment or an equitable bill of attainder.

"But if we are to disregard the policy of the statute relating to mechanics' liens, and if we are also to disregard the contract between the city and McLane, which shows that both parties had in mind the idea that the materialmen of McLane should share equally, there is another ground which is inexorably logical as well as undeniably just, on which the same result should be worked out. It is the doctrine of our supreme court in *Rieper v. Rieper*, 79 Mo. 352, the same being, so far as I can see, the last controlling decision of that court upon this question, in which the familiar rule of equity is applied that what are called equitable assets are to be divided *pari passu* among all creditors before the court. The same doctrine was stated and applied by this court in *Heiman v. Fisher*, 11 Mo. App. 275; and in *St. Louis v. Keane*, 27 Mo. App. 646.

"What then are equitable assets? Judge BAKE-WELL in *Heiman v. Fisher*, 11 Mo. App., at page 280, says that, 'equitable assets are such as can be reached only by the aid of a court of equity, and the established rule is, that assets which can only be reached in equity

must be distrubuted *pari passu* among all creditors.'
I take the rule to be that where assets are of such a
cha. .cter that they are not vendible under an execution
at law, and that no lien can be made to attach to them
by any proceeding at law, but that they can only be
reached and subjected to the demand of a creditor by
the aid and the processes of a court of equity, they are
for that reason and that reason alone equitable assets.
Nor does it appear to me to make any difference *why*,
or on what theory of law or of public policy they are
held to be available to the creditor through the aid of
processes of equity alone. To bring them within the
well known rule in respect of the distribution of equit-
able assets, it is enough that they cannot be *touched in
any way* without aid of a court of equity, and that
whatever creditor gets satisfaction out of them must
submit himself to the principles of a court whose
favorite maxim is that equity is equality.

"But to this view there is opposed the argument
that in this state, in the case of what is called a *credi-
tor's bill* in aid of an execution at law to reach assets
which have been concealed or fraudulently conveyed
by the debtor, the rule is that the creditor first filing
such a bill gets a priority over the others. Such is no
doubt the rule in this state, though the contrary princi-
ple is every day administered in the courts of the United
States here in our midst. But the assets thus pursued
and made available by the creditor are not not equita-
ble assets within the sense of the rule under consider-
ation, for the reason that they are vendible under his
execution at law. The creditor can levy upon his
debtor's interest in property which the latter has fraud-
ulently conveyed, have it sold at sheriff's sale, become
the purchaser and then bring a suit in equity to clear his
title; and I understand that a third person may become
the purchaser at sheriff's sale and have the like remedy

in equity.    Rights may thus attach to such assets in proceedings at law, which in their very nature give a priority—not merely a priority of *lien*, but a priority of *title*.

"But there is another reason which distinguishes those cases from this. In those cases the moving creditor, even where he does not first sell the debtor's interest under his execution at law, often goes to great labor and expense in uncovering assets of his debtor. It is therefore debatable, to say the least, whether he ought to be required, after fighting the battle, to allow the camp-followers who have skulked in the rear to come in and divide with him the fruits of the victory. But no such condition of things exists in respect of the question we are considering. The debtor has made no fraudulent conveyance—has concealed no assets. He has simply run away, leaving visible certain assets in the hands of a custodian who is so privileged, under the policy of the law, that that custodian can only be compelled to account for them and to distribute them by a court of equity. Shall the principle which rewards the diligence and courage of the judgment creditor, who sues to set aside a fraudulent conveyance, be applied so as to give a priority to the creditor seeking satisfaction out of such equitable assets merely because he may happen to file his bill a day before the others? This is not rewarding diligence, courage, labor and the expenditure of money. It may result merely in rewarding good fortune. The creditor first filing his bill may not even be the most diligent; he may merely be the most fortunate. A day's sickness in the case of his rival creditor, the accident of employing one lawyer instead of another, may, if this is to be the rule, turn the scale and give him all, while the others standing in equal right get none.

"I can see no difference in principle between this case and the case of *Rieper v. Rieper*, 79 Mo. 352, which was beyond question correctly decided. In both cases the assets are well known, uncovered, undenied, unconcealed; but capable of being subjected only by proceedings in equity. The moving creditor, who, as in *Rieper v. Rieper*, seeks to subject the separate estate of a married woman, gets no lien by the mere filing of his bill, and for the naked reason that the assets are equitable assets, and that it is the act of the court and not the act of the creditor that creates the lien. The lien is created by the *decree* and not by the bringing of the suit. In all such cases the well-known rule of chancery procedure is that all creditors who come in before the final decree of distribution share *pari passu.*"

In this conclusion reached by the learned dissenting judge, we concur. We think he might have safely rested it upon the case of *Rieper v. Rieper*, 79 Mo. 352, and the last ground so forcibly put in his opinion, to which we deem it necessary to add only a word in explanation of our position.

While a court of equity, under the admirable doctrine announced in the able opinion of Judge BLISS in *Pendleton v. Perkins*, 49 Mo. 565, can and will give a remedy to creditors against assets in its custody, or which can be reached only by its strong arm, yet such courts cannot create for their benefit either the process of garnishment on the one hand or the remedies to be acquired under the mechanic's lien law on the other, and are not constrained to a distribution of those assets to creditors according to the principles that would obtain under the law governing either; but will make such distribution, according to right and justice, which in this case would be (after paying Higgins & Sellers the amount found due them for the furnishing

the work out of the fund), to distribute the remainder among the interpleaders in proportion to the amounts found to be severally due them. That this may be done, the judgment of the St. Louis court of appeals affirming the judgment of the St. Louis circuit court is reversed and the same remanded to said court of appeals, to be proceeded with accordingly. All concur, except BARCLAY, J., who dissents.